UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RICHARD HOWARD THOMSON,

        Petitioner,

                                CASE NO. 2:06-CV-12619

v.                              JUDGE ROBERT H. CLELAND
                              MAGISTRATE JUDGE PAUL J. KOMIVES

JAN E. TROMBLEY,

        Respondent.

_____/


## REPORT AND RECOMMENDATION


*Table of Contents*

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.   *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.   *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.   *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    D.   *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    E.   *Miranda Claim (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        1.    *The State Court Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        2.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        3.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    F.   *Prosecutorial Misconduct (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
           a. Vouching/Personal Belief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
           b. Comments on Invocation of Rights to Silence and Counsel . . . . . . . . . . . . . . . . . . 28
    G.   *Evidentiary Claim (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    H.   *Ineffective Assistance of Counsel (Claims II, IV-VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
           a. Eliciting Testimony of the Victim's Credibility (Claim II) . . . . . . . . . . . . . . . . . . . 35
           b. Failure to Object to Prosecutorial Misconduct (Claim II) . . . . . . . . . . . . . . . . . . 37
           c. Failure to Challenge Voluntariness of Statement (Claim IV) . . . . . . . . . . . . . . . . . 38
           d. Appellate Counsel (Claims V-VI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    I.   *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
III.  NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

I.     RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.    REPORT:

A.     *Procedural History*

1.     Petitioner Richard Howard Thomson is a state prisoner, currently confined at the Saginaw Correctional Facility in Freeland, Michigan.

2.     On August 14, 2000, petitioner was convicted of one count of first degree criminal sexual conduct (CSC-I), MICH. COMP. LAWS § 750.520b; and two counts of second degree criminal sexual conduct (CSC-II), MICH. COMP. LAWS § 750.520c, following a jury trial in the Oakland County Circuit Court. On September 5, 2000, he was sentenced to a term of 15-30 years' imprisonment on the CSC-I conviction, and to concurrent terms of 5-15 years' imprisonment on the CSC-II convictions.

3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.     THE TRIAL COURT ERRED IN ADMITTING DEFENDANT'S STATEMENT TO LAW ENFORCEMENT WHERE THAT STATEMENT WAS ELICITED AFTER DEFENDANT REQUESTED THAT THE POLICE INTERVIEW BE TERMINATED, AND AFTER HE HAD ASSERTED HIS RIGHT TO COUNSEL.

II.    TRIAL COUNSEL WAS INEFFECTIVE IN AFFIRMATIVELY OFFERING TESTIMONY THAT THE COMPLAINANT WAS CREDIBLE AND IN FAILING TO OBJECT TO THE PROSECUTION'S CONTINUED REFERENCES TO DEFENDANT'S ASSERTION OF HIS RIGHT TO COUNSEL.

III.   DEFENDANT WAS DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL AS A RESULT OF THE PROSECUTOR'S MISCONDUCT IN OFFERING HER OPINION AS TO DEFENDANT'S GUILT AND IN VOUCHING FOR THE CREDIBILITY OF HER WITNESSES.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Thomson*, No. 230235, 2002 WL 1308776 (Mich. Ct. App. June 14, 2002) (per curiam).

4.  Petitioner, through counsel, sought leave to appeal these three issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Thomson*, 467 Mich. 952, 656 N.W.2d 531 (2003).

5.  On October 7, 2003, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.  DEFENDANT IS ENTITLED TO A NEW TRIAL WHERE HIS TRIAL COUNSEL AND HIS FIRST APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO ARGUE THAT HIS STATEMENT TO POLICE PRIOR TO HIS ARREST WAS COERCED AND INVOLUNTARY, AND THE STATEMENT SHOULD HAVE BEEN SUPPRESSED.

II.  DEFENDANT THOMSON IS ENTITLED TO A NEW TRIAL WERE HIS TRIAL COUNSEL REPEATEDLY PROVIDED INEFFECTIVE ASSISTANCE, AND THUS DENIED HIM A FAIR TRIAL, AND WHERE THE COURT OF APPEALS COULD NOT PROPERLY REVIEW THIS MERITORIOUS ISSUE BECAUSE HIS APPELLATE COUNSEL FAILED TO PROPERLY REQUEST AND HOLD AN EVIDENTIARY HEARING DURING HIS APPEAL OF RIGHT.

III.  DEFENDANT IS ENTITLED TO A NEW TRIAL WHERE INADMISSIBLE HEARSAY WAS REPEATEDLY INTRODUCED AT EVIDENCE AT TRIAL, AND HIS APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO ARGUE THIS ISSUE IN HIS APPEAL AS OF RIGHT.

On January 27, 2004, the trial court denied petitioner's motion for relief from judgment based on petitioner's failure to establish good cause for and actual prejudice attributable to his failure to raise the claims on direct appeal, as required by MICH. CT. R. 6.508(D)(3). The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in

standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Thomson*, 474 Mich. 932, 706 N.W.2d 26 (2005); *People v. Thomson*, No. 255166 (Mich. Ct. App. Dec. 16, 2004).

6.      Petitioner, through counsel, filed the instant application for a writ of habeas corpus on June 13, 2006.  As grounds for the writ of habeas corpus, he raises the six claims that he raised in the state courts.

7.      Respondent filed her answer on December 20, 2006.  She contends that petitioner's third, fifth, and sixth claims are barred by petitioner's procedural default in the state courts, and that petitioner's remaining claims are without merit.

8.      Petitioner filed a reply to respondent's answer on April 30, 2007.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from his sexual assault of a young girl for whom his wife provided care during the day.  The evidence adduced at trial was accurately summarized in petitioner's brief on direct appeal:

> The prosecution's first witness was Dr. Mary Smyth, a pediatrician employed by Beaumont Hospital (TII 36-37). Dr. Smyth performed the medical examination of Kelsey Runft, the complainant herein (TII 39). The physical examination was normal (TII 41). At the time of the examination, the child's mother indicated that Kelsey had been complaining about feeling moisten her genital area, and had observed her daughter to be wiping frequently (TII 43). She advised the physician that her daughter had recently alleged that she had "seen Dicky's penis" referring to Defendant Richard Thomson (TII 47-48). The doctor could not state that any abuse had, or had not, occurred (TIl 42, 48).
>
> Kelsey Runft testified that she was five years of age (TII 54). She also identified Richard Thomson, known to her as "Dicky," in the courtroom (TII 55). She also noted her familiarity with "Nana," her babysitter, and stated that both Defendant and Nana were her babysitters (Til 56). Kelsey testified that when she was four years old, that she had seen Defendant's penis (TII 61). She further testified that she touched Defendant's penis with both her tongue and with her hand (TII 62). She testified that she touched Defendant because he told her to touch him (TII 62). She

further testified that Defendant's hand and tongue touched her vaginal area (TII 64).

On cross-examination, Kelsey acknowledged that she hd spoken with several individuals about these alleged events. She had spoken to the prosecutor on several occasions both before and after the preliminary examination (TII 74-75), to her parents (TII 75), and to the individuals at Care House (TII 103-104). She recalled that initially she had told her parents that she had only seen Defendant's penis (TII 100), and that later she alleged that Defendant had also touched her (TII 102-103).

John Runft, the complainant's father, testified that he and his wife Katherine have two daughters–Kelsey and Lindsey–and that had [sic] previously been in day care with Nancy Thomson in Waterford Michigan (TIII5-6). Kelsey had been in day care at the Thomson home from the time that she was 6 or 7 months old (TIII 6). The two couples–the Runfts and the Thomsons–had also developed a personal relationship and shared holidays together on occasion (TIII 8).

Mr. Runft testified that on February 20, 2000, that his daughter Lindsey was taking a shower with him and that she pointed to his penis and said "Dicky has one of those." (TIII 12). Lindsey then put her head in his genital area and moved it around (TIII 12). Mr. Runft found this series of events very surprising and strange and proceeded she to turn of the shower, and wrap a towel around himself (TIII 12). Mr. Runft went downstairs to talk to his wife about these events. He told her what Lindsey had said, and in response, his daughter Kelsey entered the room and said that she had also seen Defendant's penis (TIII 14).

As a result of his daughters' allegations, the Runfts contacted Defendant and his wife (TIII 16). Subsequently, Lindsey continued to attend day care at the Thomson's residence with the agreement that Defendant would not return home until she was gone for the day (TIII 16). Subsequently, Kelsey was interviewed at Care House (TIII 17). After that interview, additional allegations were made by Kelsey as to Defendant's conduct (TIII 49).

Katherine Runft testified that she was also acquainted with both defendant Richard Thomson and his wife, Nancy, and that Nancy Thomson was the day care provider for the Runft children beginning at the time that Kelsey was 6 months old (TIII 63-64). Mrs. Runft recalled February 20, 2000, at which time the allegations herein were advanced by her daughter Kelsey (TIII72). On that day, her husband Jon Runft had been taking a shower with the couple's younger daughter Lindsey (TIII 73). At some point, Jon Runft came downstairs and advised his wife of Lindsey's statement (TIII74). Kelsey was present during this conversation and responded by advising that she too had seen Defendant's penis (TIII 74). Kelsey advised that it had occurred at nap time and that she had touched Defendant's penis with her hand and her mouth (TIII 79).

Ms. Runft subsequently contacted the Thomson's regarding these allegations (TIII 80). Arrangements were made for Lindsey to continue to attend day care at the Thomson home, but Defendant agreed not to be present at the residence during those time periods (TIII 81). That arrangement continued until the Care House interview occurred (TIII 81). It was at that interview that Kelsey also indicted that Defendant had touched her with his hand and his tongue as well as asking her to touch his

genital area (TIII 114).

Michigan State Police Trooper Barbara Ulatowski testified as to her conversations with Defendant at the Michigan State Police Post. Defense Counsel objected to the trooper's testimony in that it related to the polygraph examination, and he further objected to any references that might be made to the giving of *Miranda* rights, and the danger of unfair prejudice (TIII 118-120, 123). The trial court declined to exclude the witness and ruled that "I think the relevancy outweighs [the danger of unfair prejudice] and I think precautions have been taken and I'm satisfied that there will be no references to the polygraph." (TIII 123).

Trooper Ulatowski testified that she had interviewed Defendant at the police department and that he was free to leave at all times (TIII 124). She further testified, over Defendant's continued objection, that she had advised him of his *Miranda* warnings although she was not legally bound to do so (TIII 125-126). The trooper noted that although Defendant denied the allegations throughout the interview, at the end of the interview when asked whether he was sorry for his actions, that in response, he slumped his shoulders, dropped his head and nodded affirmatively (TIII 129-130). Subsequently, the trooper also testified that Mr. Thomson declined additional comment and inquired as to whether he ought to have a lawyer (TIII 131).

Waterford Township Detective Jon Hoke testified that after being contacted by the Runfts, he set up an interview at Care House (TIII 139). He identified Care House as "possibly the best instrument to be used in the investigation of chid abuse and neglect and that includes child sexual assault" (TIII 142). He testified that Care House creates a child friendly environment in which numerous individuals can observe the interviewing process with the child (TIll 143). The officer testified that on the day of Kelsey's interview, that he was present as was a member of the Prosecutor's Office–Mary Kay Neuman who conducted the interview (TIII 145). Subsequent to that interview, Sgt. Hoke requested that Defendant meet with him to speak about the allegations (TIII 141). Defendant voluntarily met with the detective, and he denied the allegations (TIII 148).

Sgt. Hoke then asked Mr. Thomson to accompany him to the State Police Post for further interviewing. Defendant agreed to do so and was met by Trooper Ulatowski at the Michigan State Post (TIII 151). Sgt. Hoke observed the subsequent interview through a closed circuit television, and noted that the interview stopped when Mr. Thomson made such a request (TIII 151). Upon ending the interview, Mr. Thomson exited into the hallway where he was approached by Sgt. Hoke (TIII 152). The officer recognized that Mr. Thomson was in distress and invited him for a cigarette (TIII 152). Sgt. Hoke wanted Mr. Thomson to talk with him (TIII 153). The officer was "convinced he was guilty" and his job was to try to get a statement from Mr. Thomson (TIll 153). Mr. Thomson speculated about the need for a lawyer, but with some coaxing he agreed to talk to Sgt. Hoke (TIII 156). The officer alleged that Mr. Thomson then agreed that the incident had in fact occurred one time in the upstairs bathroom of his home (TIII 157).

On cross-examination, Sgt. Hoke agreed that one of the Care House stated goals was to increase the rate of prosecution of abusers (TIII 166). He further

acknowledged his familiarity with the Governor's Task Force Forensic Interview Protocol (TIII 167). He agreed that the Protocol recommends, though does not mandate, video-taping of interviews with children (TIII 177), and also agreed that Care House does not video-tape such interviews (TIII 177).

Defendant called several witnesses in his defense. Mary Kay Neuman, an employee of the Oakland County Prosecutor's Office, testified that she conducted the interview of Kelsey Runft at Care House (TIII 203). That interview was not video-taped as that is not the protocol followed in Oakland County (TIII 203). Several individuals did observe the interview through a one-way mirror (TIII 212). Ms. Neuman did not take any notes during the interview (TIII 206), nor could she recall the specific questions asked or the verbatim answers of the child (TIII 206-207, 209, 210). Prior to the interview, Ms. Neuman obtained information regarding the allegations from Detective Hoke (TIII 211).

In response to questioning by Defense Counsel, Ms. Neuman described "suggestibility" – the idea that ideas might be subject to being planted in the way that questions are posed to children (TIII 217). The witness testified that she did not believe that the complainant was suggestible (TIII 218). She further testified, in response to specific defense questions, that she had assessed the child's credibility and believed that the allegations were true (TIII 221-222).

On cross-examination by the prosecution, Ms. Neuman discussed the goals of Care House as providing safety to the children, reducing trauma, and the provision of an investigative law enforcement tool (TIII 223-24). She was further permitted to testify, without objection, that a further goal of Care House was the development of the truth and to encourage the successful prosecutions of potential perpetrators (TIII 226). The prosecution obtained an acknowledgment by Ms. Neuman that the use of the Governor's Protocol was to "ensure the truth is coming out." (TIII 226). The prosecution also elicited a statement from the witness, over a defense objection, that many cases are not recommended for prosecution (TIII 233-234). The trial court permitted this inquiry as a result of Defense Counsel's direct examination:

"I think that's it's [sic] – you have made a point throughout of a kind of planting ideas and leaning towards prosecution and I think it's appropriate to just simply ask if they – if she's aware of any cases where they didn't proceed." (TIII 234).

Defendant subsequently called Carol Ross, an employee of the Macomb County Psycho Diagnostic and Family Services Clinic, as a witness (TIII 244). Ms. Ross was qualified as an expert in behavioral investigations (TIII 251). Ms. Ross testified that the literature regarding the interviewing of potential child sexual abuse victims is replete with references to the compliant behavior of children (TIII 259). She noted that the Governor's Task Force Protocol is a protocol developed with an eye to preventing bias and suggestibility in child witnesses (TIII 261). She further noted that the idea of video-taping or audio-taping those interviews is borne out of a concern regarding suggestibility and interviewer bias (TIII 264). Such memorializing also reduces the risk of interpretation of the interview by observers (TIII 288).

Ms. Ross cited studies which concluded that even experienced interviewers who believed that they were asking open-ended questions were sometimes guilty of suggesting answers to children (TIII 264-265), and she further cited a study which determined that 75% of children interviewed quickly conformed to the interviewer's bias rather than depending upon their own recollections (TIII 267). Ms. Ross indicated concerns that if an interviewer "believes" the child, then the risk exists that the child may pattern their responses to go along with the perceived adult perceptions (TIII 269). Ms. Ross testified that "every contact by an adult has the potential of influencing a kid "So we have to be – careful." (TIII 289). The prosecution objected to the witness' offering an opinion as to Kelsey Runft's suggestibility in this matter (TIII 266).

Nancy Thomson, Defendant Richard Thomson's wife, testified that she had cared for the Runft children in her home for approximately five years prior to the allegations herein, and from the time that Kelsey Runft was four months old (TIV 11). During that time, she was also providing day care services for two other children (TIV 13). Ms. Thomson recalled that she and Defendant developed a close friendship with the Runfts and would share holidays and birthdays during the years (TIV 18). She also recalled the Sunday evening on which she received a telephone call from the Runfts alleging the instant misconduct by her husband (TIV 15). She noted that subsequent to that phone call, she continued to provided day-care services for Lindsey Runft, and did so until the date of the Care House interview (TIV 16).

Ms. Thomson reviewed the years of her day-care to the Runft children. She noted that over the years there were rare occasions during which she would have to run an errand during the day and the children would stay at the house with her husband (TIV 23). The childrens' parents were always informed ahead of time in the event of such an occurrence (TIV 23). There was never any opposition or any concern by the parents (TIV 23).

Ms. Thomson further described her household, with the master bedroom being downstairs and the napping rooms used by the children being upstairs (TIV 25). She also explained that her husband was generally at work until approximately 3:45 P.M., which was approximately fifteen minutes period to the children big picked up, and just after they had awakened form their afternoon naps (TIV 27). The kids were always excited to see Richard Thomson (TIV 29).

Defendant Richard Thomson testified in his defense after acknowledging that he understood that the choice to testify was his own (TIV 5-7, 41). Mr. Thomson testified that he knew Kelsey and Lindsey Runft because his wife provided in-home day care for the girls (TIV 42). He and his wife had a very good friendship with the Runfts which developed over the years (TIV 43). He testified that he only very rarely cared for the children in his wife's absence (TIV 46), and recalled only one time that he came home earlier than his normal 4:00 P.M. to watch the children when his wife had an errand to run (TIV 47). He never had one-on-one time with any of the children that his wife cared for (TIV 49).

Defendant recalled that his wife received a telephone call from the Runfts on February 20, 2000, in which the instant allegations were raised (TIV 50). He

immediately telephoned Kathy Runft and vehemently denied the allegations (TIV 51). He offered to cooperate in any way necessary in order to resolve the issue (TIV 51). Soon thereafter, he was contacted by Detective Hoke and voluntarily attended an interview at the Waterford Police Department (TIV 52-53). During that first meeting, Mr. Thomson denied all the allegations (TIV 54).

Subsequently, Mr. Thomson again voluntarily met with Detective Hoke, and with Michigan State Trooper Ulatowski (TIV 58). During the latter interview, the trooper continually accused Defendant of committing the alleged offenses and he continued to deny that anything had occurred (TIV 59). The accusations finally ended when Mr. Thomson said that he wanted to speak to an attorney (TIV 59). At that point, he left the room and saw Detective Hoke who was waiting about twenty feet down the hallway (TIV 64). The detective invited Defendant to have a cigarette outside and he agreed (TIV 65).

Mr. Thomson testified that he was very upset and was angry over the accusations being made (TIV 65). Detective Hoke also started to accuse Defendant of having committed these acts (TIV 66). Mr. Thomson continued to deny the charges, but the officer encouraged him to admit culpability – he said that he would vouch for Defendant's character if he would step forward and admit the alleged acts (TIV 67). He said that he could only help if Mr. Thomson admitted his involvement (TIV 71). Defendant adamantly denied any misconduct and told the officer:

> "I told him, I said, you gotta be kidding me. I just got done telling you I had no involvement in this whatsoever and now you think you want me to make something up. You want me to make something up that fits these allegations? He says, like what?
>
>     * * *
>
> Yeah. I said, yeah, okay, like the little girl walked in on me in the bathroom and touched and kissed my penis, is that what you want me to make up? Ands all he said was, how would that make you feel? I said that's just sick." (TIV 71).

Mr. Thomson testified that he was being extremely sarcastic in his statements and told the officer that the whole idea was disgusting (TIV 72-73). He denied ever admitting to the officer that he had committed the alleged acts against Kelsey Runft (TIV 74). Mr. Thomson was devastated by the time be left the officer's presence (TIV 91).

On rebuttal, the prosecution recalled Detective Hoke. He testified that Trooper Ulatowski never raised her voice during their conversations with Defendant (TIV 92). He also stated that he observed Mr. Thomson shake his head "yes" when he was asked whether he was sorry and if he needed counseling (TIV 93). The officer was also permitted to testify, over defense objection, that he had advised Defendant of his *Miranda* rights prior to his making the final statement (TIV 97).

Katherine Runft also testified on rebuttal. She noted that when she picked up her daughters from day care that Defendant was generally at home (TIV 100). She also testified to a conversation with Nancy Thomson in which Ms. Thomson allegedly stated that she was beginning to doubt his innocence (TIV 103). The court

permitted this testimony as impeachment because Ms. Thomson had previously testified that she did not believe that her husband had committed the alleged acts (TIV 103-105). Defense counsel requested that the he be permitted to recall Nancy Thomson to deny the making of any such statement, but that request was denied (TIV 107-108). Subsequently, the trial court clarified that Defense counsel had ample opportunity to question Nancy Thomson regarding the alleged statement made to Ms. Runft when Ms. Thomson was on the stand and was questioned as to this statement by the prosecution. Thus, the court found no basis to permit Defendant to recall his wife as a defense rebuttal witness (TIV 110).

Def.-Appellant's Br. on Appeal, in *People v. Thomson*, No. 230235 (Mich. Ct. App.), at 15-25 (footnotes omitted).

C.     *Procedural Default*

Respondent first contends that petitioner's third, fifth, and sixth claims–alleging respectively prosecutorial misconduct, ineffective assistance of trial counsel, and improper admission of hearsay evidence–are barred by petitioner's procedural default in the state courts, either because petitioner failed to object at trial or failed to raise the claim on direct appeal. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also, Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation

omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Even were the Court to conclude that petitioner's claims are procedurally defaulted, it is still necessary to consider the claims on the merits. A habeas petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his trial or appellate counsel was ineffective for failing to raise his defaulted claims. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

>(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.      *Miranda Claim (Claim I)*

        1.      *The State Court Proceedings*

Prior to trial, petitioner objected to the introduction of his statement to Detective Hoke on

the ground that the statement was taken in violation of his Fifth Amendment privilege against self-incrimination. The testimony taken at the evidentiary hearing was accurately summarized in the prosecutor's brief on petitioner's direct appeal:

Detective Sergeant Jon Hoke testified that Defendant voluntarily came to the Waterford Police Station on March 1,2000. (EH 22-23) Defendant was not under arrest. (EH 23) At that time, Defendant was advised of the allegations against him. Defendant agreed to take a polygraph examination and arrangements were made. (EH 23-24, 33) On March 3, 2000 Defendant arrived at the Northville Crime Lab around 1:00 p.m, as scheduled. (EH 5-7, 24) Defendant was not in custody or under arrest at the time. Defendant drove his own vehicle. He was not accompanied by a police officer, nor was he handcuffed. (EH 6, 24-25) Michigan State Trooper Barbara Ulatowski was the polygraph examiner. (EH 4) Det. Hoke observed the examination on closed circuit television. (EH 25) Prior to the test, Defendant was told he was free to leave. (EH 7-8) In addition, Trooper Ulatowski read Defendant his polygraph examination rights from a polygraph waiver form. (EH 7-8) The form was admitted as an exhibit. (EH 7-9; Appendix C) Because Miranda warnings were also on the form, "she also gave Defendant his *Miranda* rights," (EH 8-9; Appendix C) Defendant indicated that he understood those rights. (EH 9) And, Defendant signed the form. (EH 9; Appendix C) The polygraph examination was then performed. After the test, Trooper Ulatowski left the room for 5-10 minutes to examine the charts and formulate her opinion. The door to the exam room was unlocked during this period. When she returned, she told Defendant the results of the examination. (EH 10-12) When the trooper explained the results and what she determined from the results, Defendant nodded his head affirmatively. (EH 12, 20) Trooper Ulatowski testified that Defendant never asked for a lawyer or asked to speak to an attorney. (EH 15) The trooper testified that Defendant did say: "I don't know if I should talk to you. Maybe I should talk to someone, maybe an attorney. I don't know . . . " (EH 16) The trooper thought Defendant was thinking out loud, and seemed uncertain. (EH 16) Defendant also said he did not want to talk to her. So she stopped, left the room, and had no further contact with Defendant. (EH 16-18, 19)

Det. Hoke testified that he heard Trooper Ulatowski tell Defendant (via closed circuit television) the results of the polygraph test. (EH 25-26) He recalled that the trooper attempted to talk to Defendant about the case and that Defendant declined to talk to her about it. (EH 26, 30-31) Det. Hoke did not recall whether Defendant, while in the exam room with Ulatowski, made any mention of an attorney. (EH 26, 30) At that point Defendant left the examination room and came out to the lobby. Det. Hoke began a conversation with Defendant about the case during which they left the building to have a cigarette. (EH 26) Det. Hoke agreed that Defendant initially appeared distraught. (EH 32) Once outside, Defendant seemed to calm a little. (EH 36) Det. Hoke explained the purpose of going outside was to help Defendant unwind from what he had been through. The detective stated,

"I did not want to take advantage of the man . . . I wanted him to be able to think and it seemed to have that effect . . ." (EH 36-37) Det. Hoke told Defendant he was aware of the polygraph test results and that he wanted to talk to Defendant about the case in light of the results. (EH 26-27, 38) Det. Hoke told Defendant that there was a four year old girl out there that needed some closure, that it was up to Defendant in large part as to how that would be accomplished, and that he really wanted Defendant to talk to him. (EH 27, 38) Hoke acknowledged that he played to Defendant's sense of decency. (EH 39) Hoke also told Defendant something to the effect that if Defendant talked to the detective, he would let the prosecutor know Defendant cooperated with the investigation. (EH 44) About that time, Defendant said, "I wonder if I need an attorney." (EH 28, 38) The detective told Defendant in response, "you have that right. You don't have to say anything to me. Obviously I want you to. You can leave. You came here on your own, you leave on your own." (EH 38) Det. Hoke testified that Defendant never said he wanted to speak to an attorney or have counsel present–"He did not request one, he speculated." (EH 27, 33-34, 45) Det. Hoke advised Defendant that he would not be arrested that day whether they did or did not have a conversation. (EH 40-41) Defendant agreed to talk to Hoke and they went back inside the building. (EH 27, 48-49) Det. Hoke testified that Defendant was never under arrest that day. The detective acknowledged that if Defendant had not agreed to go inside, he would have been free to leave. (EH 29) And, even after Defendant did make certain statements to Hoke, Defendant was still free to leave. (EH 29) Defendant was arrested some days later. (EH 39)

Defendant testified that he went to the State Police post for a polygraph examination on March 3, 2000. (EH 57) Defendant acknowledged that Trooper Ulatowski advised Defendant of his rights and that his signature appeared on Exhibit 1. (EH 57-58) Defendant testified that after the examination, he and the trooper had a conversation during which he asked to speak to an attorney. (EH 58) According to Defendant, he asked for an attorney more than once. (EH 59) Defendant testified that Trooper Ulatowski did stop questioning him after those requests. (EH 59) Defendant confirmed that after the test he met Det. Hoke in the hallway near the lobby, that they had a conversation, and that they agreed to go outside to have a cigarette. (EH 59-60) Defendant indicated that he had been very upset by what Trooper Ulatowski had just told him that he did not pass the polygraph test. (EH 60) Defendant testified that immediately upon going outside, Det. Hoke said to him, "it looks like you've got a big problem now. It seems to me that you've done this." (EH 60) Defendant admitted that the detective's tone was conversational. (EH 61) According to Defendant, he stated in response, "if that's the way you feel, I want to speak with an attorney immediately." (EH 61) According to Defendant, Det. Hoke then said, "no, no, no, it's not like that. It's not like I'm going to slap the cuffs on you and haul you away just yet . . . But I'd really like to talk to you about this." (EH 61) Defendant testified that although he believed he was free to leave, the detective's comment about not slapping the cuffs on him just yet was "kind of intimidating." Defendant further stated, "I felt I should just stay and at least hear the man out." (EH 63) On cross-examination, Defendant indicated that he was employed as an engineering technician

in a materials characterization laboratory and that he had completed some college. (EH 69) Defendant acknowledged that he knew he was free to leave after talking with Trooper Ulatowski. (EH 69-70, 72) Defendant also acknowledged that he knew he did not even have to show up for the polygraph exam. (EH 72)

Following arguments by the parties for and against suppression of Defendant's statements to police, the trial court ruled as follows:

> "The fact of the matter in this case was that [Defendant] was not under arrest. He was free to leave at any time. The police officers–the police officer in this case, Sergeant Hoke, did nothing improper. The best we heard from your client was that it was kind of intimidating. Accordingly, the Court finds that number one, that there was no arrest here. That there was no obligation for *Miranda*. Furthermore, with the totality of the circumstances, there is no showing in any manner that the statements that were made were anything other than freely and knowingly and voluntarily made. Accordingly, motion is denied . . ." (EH 76-77)

Appellee's Br., in *People v. Thomson*, No. 230235 (Mich. Ct. App.), at 3-7 (footnotes omitted).

On appeal, the Michigan Court of Appeals rejected petitioner's claim, concluding that *Miranda* was inapplicable. The court explained that the *Miranda* warnings are required only prior to custodial interrogation. Here, the court concluded, "[t]he facts adduced at the evidentiary hearing clearly established that defendant was not in custody when he was interviewed by the police." *Thomson*, 2002 WL 1308776, at *2, slip op. at 2. Specifically, the court noted that petitioner voluntarily appeared and was explicitly told that he was not in custody and was free to leave. Accordingly, the court concluded that *Miranda* was inapplicable. *See id.*

2.      *Clearly Established Law*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court considered the applicability of the Fifth Amendment's Self-Incrimination Clause to custodial interrogations by the police. The Court ruled that, in some circumstances, statements made while in custody can violate the Self-Incrimination Clause even if the statement was otherwise "voluntary" under the Due Process Clause. As the Court has more recently explained, the *Miranda* decision

> concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself." [*Miranda*, 384 U.S.] at 439. Accordingly, we laid down "concrete guidelines for law enforcement agencies and courts to follow." *Id.*, at 442. Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires." *Id.*, at 479.

*Dickerson v. United States*, 530 U.S. 428, 435 (2000) (parallel citations omitted). The *Miranda* Court explained that if the suspect indicates that he wishes to remain silent, "the interrogation must cease." *Miranda*, 384 U.S. at 474. Similarly, if the suspect requests counsel "the interrogation must cease until an attorney is present." *Id.*; *see also*, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Although it has been characterized otherwise at times, the rule of *Miranda* is of federal constitutional dimension. *See Dickerson*, 530 U.S. at 438-40. Thus, claims based on the right to counsel at questioning recognized in *Miranda* are cognizable on habeas review. *See id.* at 439 n.3; *Thompson v. Keohane*, 516 U.S. 99, 107 n.5 (1995).

The *Miranda* rule protects a suspect's Fifth Amendment privilege not to be "compelled" to incriminate himself. The rule is based on the notion that "custodial police interrogation, by its very nature, isolates and pressures the individual," and therefore "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" *Dickerson*, 530 U.S. at 435 (quoting *Miranda*, 384 U.S. at 439). To guard against this, *Miranda* "laid down 'concrete guidelines for law enforcement agencies and

courts to follow.'" *Id.* (quoting *Miranda*, 384 U.S. at 442). This rationale for the rule, however, also limits its applicability to only those interrogations which are "custodial." *See Thompson*, 516 U.S. at 102; *California v. Beheler*, 463 U.S. 1121, 1124 (1983) (per curiam); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977) (per curiam). "Custody for *Miranda* purposes has been . . . narrowly circumscribed." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984). As the Court explained in *Miranda*, an interrogation is custodial only where the suspect "has been taken into custody or otherwise deprived of is freedom of action in any significant way." *Miranda*, 384 U.S. at 444. In other words, although a court must consider the totality of the circumstances surrounding the interrogation, the ultimate inquiry is whether there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Murphy*, 465 U.S. at 430 (internal quotation omitted); *see also*, *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *Beheler*, 463 U.S. at 1125. The ultimate question is not the suspect's subjective belief, but how a "reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004).

In determining the validity of the police interrogation, the ultimate issues of whether petitioner waived his rights to remain silent and to counsel are legal determinations to be reviewed under § 2254(d)(1). *See, e.g.*, *Thompson*, 516 U.S. at 112-13 (determination of whether interrogation was a "custodial interrogation" under *Miranda* is a legal determination not subject to the presumption of correctness for state court findings of historical fact); *Brewer v. Williams*, 430 U.S. 387, 397 n.4 (1977) (same as applied to question of whether petitioner validly waived his Sixth Amendment right to counsel). However, the state courts' resolution of the underlying historical facts are presumed correct unless rebutted by clear and convincing evidence to the contrary. *See* 28

U.S.C. § 2254(e)(1).

3.    *Analysis*

Here, the Michigan Court of Appeals's determination that petitioner's interrogation was not custodial was reasonable. The testimony at the evidentiary hearing was undisputed. Petitioner voluntarily arrived at the police station to talk a polygraph examination. *See* Evid. Hr'g Tr., at 24-25. Petitioner was informed prior to the polygraph that he was free to leave. *See id*. at 7-8. After Trooper Ulatowski informed petitioner of the results and he indicated that he did not wish to speak with her further, petitioner left the room and went to the lobby of the building. *See id*. at 26. Petitioner then went outside with Detective Hoke to have a cigarette. Hoke told petitioner that he did not have to talk to Hoke, and that he could leave. *See id*. at 27-28, 33-34, 38, 40-41, 45. Petitioner himself testified that he knew he did not have to show up for the polygraph examination, and that he was free to leave after the examination. *See id*. at 69-70, 72. Petitioner also testified that after leaving the building, Hoke's tone was conversational and he was aware that he was free to leave at that time. *See id*. at 61, 63. Petitioner ultimately left the state police post, and was not arrested until several days later. The facts established at the evidentiary hearing show that petitioner's freedom of movement was not restrained to the degree associated with formal arrest. Petitioner voluntarily appeared at the State Police post, was repeatedly told that he was free to leave, was not restrained in any way during his time at the police post, and was permitted to leave after speaking with Detective Hoke. Similar facts have been held insufficient to establish that an interrogation was custodial. *See Mathiason*, 429 U.S. at 494; *Mason v. Mitchell*, 320 F.3d 604, 632 (6th Cir. 2003); *United States v. Protsman*, 74 Fed. Appx. 529, 535 (6th Cir. 2003).

Petitioner argues that his interrogation was custodial because several facts made him feel that

he was not free to leave. Specifically, petitioner contends that he was alone in a police station with no people to support him; he was in the oppressive environment of a police interrogation room; he was subjected to a police requested lie detector test; he had been read his *Miranda* rights; he was intimidated by the questioning; and he was afraid that if he left he would irritate Hoke and incriminate himself. However none of these factors, alone or taken together, establishes that petitioner's interrogation was custodial.

At the outset, petitioner's claim that he did not feel free to leave is belied by his own testimony at the evidentiary hearing. *See United States v. Padilla*, No. 04-60001-CR, 2006 WL 3678567, at *6 (S.D. Fla. Nov. 17, 2006) ("Defendant's own words suggest that he believed that he was free to leave, thus this Court need not even consider whether a 'reasonable man' in this situation would feel restraint on his freedom of movement to the degree associated with formal arrest, since Padilla himself did not feel such restraint.") In any event petitioner's subjective belief that he was not free to leave, assuming he had such a subjective belief, does not affect the analysis. Rather, "the only relevant inquiry is how a reasonable man in [petitioner]'s position would have understood his situation." *Berkener v. McCarty*, 468 U.S. 420, 442 (1984); *see also*, *Thompson*, 516 U.S. at 112; *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). For the reasons explained above, a reasonable person in petitioner's position would have felt free to end the interview and leave at any time. Similarly, "[i]t was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial interrogation." *Beckwith v. United States*, 425 U.S. 341, 346-47 (1976) (internal quotation omitted). Thus, the *Miranda* requirements do not extend to the otherwise non-custodial interrogation merely because the police

had focused on petitioner as a suspect in a criminal case. *See Stansbury*, 511 U.S. at 323-34; *Berkener*, 468 U.S. at 442; *Murphy*, 465 U.S. at 431; *Mathiason*, 429 U.S. at 495. Nor does the fact that the interview took place at a state police post lead to the conclusion that the interrogation was custodial. *See Beheler*, 463 U.S. at 1125-26; *Mathiason*, 429 U.S. at 495; *United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004) (en banc). The fact that petitioner had been confronted with the fact that he had failed the polygraph examination likewise did not render the interrogation custodial. *See Mathiason*, 429 U.S. at 495-96 (officer's false statement about finding suspect's fingerprint at scene of crime had "nothing to do with whether [the suspect] was in custody for purposes of the *Miranda* rule."). Finally, the fact that the police had given petitioner the *Miranda* warnings "in a noncustodial setting do[es] not convert that setting into a custodial one for *Miranda* purposes." *United States v. Burnette*, 535 F. Supp. 2d 772, 784 (E.D. Tex. 2007) (citing *United States v. Lewis*, 556 F.2d 446, 449 (6th Cir. 1977)); *see also, United States v. Wolfe*, 116 Fed. Appx. 228, 234 (6th Cir. 2006).

In short, petitioner's assertion that there was a coercive aspect to the interrogation does not render the interrogation a custodial one. As the Court explained in *Mathiason*:

> Such a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.

*Mathiason*, 429 U.S. at 495.

In his reply brief, petitioner argues that his claim is viable in light of *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000). In that case, the Sixth Circuit held that the prosecution's use of a suspect's prearrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination. *See id*. at 283. In reaching this conclusion, the court explained its belief "that the application of the privilege is not limited to persons in custody or charged with a crime, it may also be asserted by a suspect who is questioned during the investigation of a crime." *Id*. *Combs* does not support petitioner's claim, for two reasons. First, *Combs* dealt with a different question than that presented here. In *Combs*, the question was whether a suspect's silence could later be used against him as substantive evidence of guilt consistent with the Fifth Amendment. Here, on the contrary, petitioner's silence was not used against him. Rather, the question here is simply whether petitioner's subsequent statement to Detective Hoke was taken in violation of the Fifth Amendment notwithstanding his alleged prior assertion of his right to remain silent and to counsel. That question depends solely on whether the interrogation of petitioner was custodial.

Second, as the *Combs* decision itself makes clear, no clearly established law as determined by the Supreme Court dictates the result reached in *Combs*. On the contrary, as the court noted, the closest the Court has come to answering the question before it was Justice Stevens's concurring opinion in *Jenkins v. Anderson*, 447 U.S. 231 (1980), in which Justice Stevens indicated that the prohibition on the use of a defendant's silence as substantive evidence does *not* apply to pre-custody silence. In any event, even if *Combs* were otherwise on point, and even if Justice Stevens's concurring opinion in *Jenkins* does not definitively resolve the issue, *Combs* does not constitute "clearly established federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), upon

which petitioner may base his claim for relief. *See Jones v. Trombley*, No. 05-CV-71742, 2007 WL 496668, at *3 (E.D. Mich. Feb. 13, 2007) (Borman, J.); *Cameron v. Birkett*, 348 F. Supp. 2d 825, 841-42 (E.D. Mich. 2004) (Gadola, J., adopting report and recommendation of Komives, M.J.); *Mitchell v. Lafler*, No. 02-CV-74805, 2003 WL 21817616, at *4 (E.D. Mich. July 10, 2003) (Cohn, J.).

In short, the Michigan Court of Appeals reasonably applied clearly established federal law in determining that the police questioning of petitioner was not a "custodial interrogation" and thus that the prophylactic rule of *Miranda* was inapplicable. And because petitioner's interrogation was not custodial, the police were not required to cease questioning him when he purported to invoke his right to remain silent or to counsel. *See United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999); *Moos v. Norton*, 789 F. Supp. 352, 359-60 (D. Kan. 1992); *cf. McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) ("We have in fact never held that person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'"). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Prosecutorial Misconduct (Claim III)*

Petitioner next contends that he was denied a fair trial by the prosecutor's offering of her opinion of petitioner's guilt and vouching for the credibility of her witnesses. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with

unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted).

2.      *Analysis*

Petitioner points to a number of comments which he contends deprived him of a fair trial, which can be broken down into two categories: (1) vouching and expression of personal belief; and (2) commenting on petitioner's invocation of his rights to remain silent and to counsel.

### a. Vouching/Personal Belief

First, petitioner contends that the prosecutor expressed her personal belief in petitioner's guilt or the lack of credibility of the prosecutor's witnesses, and vouched for her own witnesses a number of times. Specifically, petitioner points to the following comments:[1]

---

[1]In his brief, petitioner states that these are only the particularly egregious examples of the prosecutor's improper comments, suggesting that other instances of misconduct exist. However, it is not the job of a federal habeas court to search the record and ferret out potential prosecutorial misconduct claims. Rather, to be entitled to relief a petitioner must point to specific statements or comments which, alone or together, deprived him of a fair trial. *See Avincola v. Stinson*, 60 F. Supp. 2d 133, 161 (S.D.N.Y. 1999). Accordingly, I address only those comments specifically identified by petitioner.

1. "Now a lot of people think about child molesters – he is a child molester. That's what this trial is about. He is a child molester. That sounds really harsh. He has a nice suit on. He looks like a great guy. Someone who you want to go out and have a drink with. Seems like someone who would be nice to children, who loves children. He has his own children. So it's hard to think of him for what he is. He is a pedophile." Trial Tr., dated 8/14/00, at 118.

2. "Defense counsel wants us to show you a video of this happening or some kind of smoking gun kind of thing, but I'd point out to you that if you were this Defendant and you were a pedophile, as he is, do you do this when you know your wife's about to come upstairs? Do you do this while you[r] wife is home? No." *Id*. at 151-52.

3. The prosecutor's assertion that Kelsey's accusations should be accepted at face value and that the jury should convict on that basis alone, because Kelsey "had no reason to lie.[2]

4. "On the way home [from the hospital] she asks her mommy, she says you know why did they have to check my private? Why did the doctor do that? And Mrs. Runft says, well, we have to make sure you're not hurt. And Kelsey very honestly says 'Dicky didn't hurt me when he touched my private." *Id*. at 122.

5. "If you think Hoke's a liar, again, you know, not guilty. What the heck. I mean you really think he's going to come in here and lie to you after 24 years at the police department. That he picked this case to ruin his career. Find him not guilty. Find Defendant not guilty." *Id*. at 158.

6. "The other defense in this case is that we're all co-conspirators. We're all in this together. It's like there's a glut of pedophiles and we gotta go out and start beating the bushes. Now, I'd love to tell you that there aren't many pedophiles in Oakland County, but when I'm done here I'm picking another jury and I have hundreds of files back in my office. We don't need to drum up business. There are plenty of pedophiles in Oakland County. We don't need to drum up business. There are plenty of pedophiles in Oakland County. Of course, Sergeant Hoke, a 24 year veteran, has to drum up business. Months away from retirement, he needs this kind of aggravation, right. He is so determined to go after the Defendant, this Defendant, I mean, he arrests someone and brings charges, that's extra work for him. He's had to sit here holding my hand for the last week. Wants to drum up business, right?" *Id*. at 161.

7. Referring to the credibility of petitioner's testimony: "He's had a long time to think about what he's going to say to you and he's heard all the testimony. He's heard

---

[2]Petitioner provides no citation to the record with respect to this particular argument.

Kelsey testify twice, Sergeant Hoke testify three times. So he's had a long time to think about what he's going to say to you." *Id*. at 127.

8.    Referring to petitioner's expert witness sarcastically: "A person who got five grand to regurgitate literature and studies to you. That's who you should believe."

To be sure, in each of these instances the prosecutor was suggesting to the jury which witnesses it should find credible and which witnesses it should find incredible. Contrary to petitioner's argument, however, there is nothing improper in this type of argument. Rather, improper vouching occurs only either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[3]

At the outset, it should be noted that the prosecutor's comments were a fair response to the attacks on the prosecution's case made be defense counsel. The entire defense was premised on the theory that Kelsey's initial report to her parents was a lie, and that from this lie a web of lies and half-truths was concocted by the prosecutor and police through deceptive interrogation and suggestive interview techniques, and outright false testimony. As the Supreme Court has explained, an important factor in evaluating the permissibility of prosecutorial comments is whether the prosecutor's statements were "invited by or was responsive" to the defense. *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986).

More importantly, here, the prosecutor's comments did not express a personal belief in the

---

[3]Some cases referring to only the first type of comment as "vouching" and describe the second type of comment as "bolstering." *See Francis*, 170 F.3d at 551.

witnesses' credibility (or lack thereof), or imply that the prosecutor had special knowledge of facts not before the jury. Rather, the prosecutor merely argued to the jury that the evidence and common sense should lead it to conclude that the prosecution's witnesses were credible and that the defense witnesses were not. The prosecutor's comments were merely a fair characterization of the evidence presented to the jury based on her summation of that evidence. As such, they did not constitute impermissible vouching for the credibility of the witnesses or the guilt of petitioner. *See, e.g.*, *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence); *United States ex rel. Williams v. Washington*, 913 F. Supp. 1156, 1163 (N.D. Ill. 1995) (prosecutor's assertion during closing argument that the defendant had "lied" did not deprive petitioner of a fair trial where "the prosecution's statements were reasonable inferences drawn from the physical evidence and witness testimony[.]"). Further, "it is well established that juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. While common sense is no substitute for evidence, common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence." *U.S. v. Durham*, 211 F.3d 437, 441 (7th Cir. 2000) (internal quotation omitted). Thus, the prosecutor was permitted to urge the jury to use its common sense in evaluating the credibility of the witnesses' testimony. *See United States v. Catano*, 65 F.3d 219, 228 (1st Cir. 1995); *United States ex rel. Hamilton v. Ellingsworth*, 629 F. Supp. 356, 366 (D. Del. 1988). Finally, the prosecutor's comment that petitioner was a pedophile was a fair inference from the evidence. *Cf. Kappos v. Hanks*, 54 F.3d 365, 367-68 (7th Cir. 1995) (petitioner not denied a fair

trial where prosecutor referred to him as a "murderer" and "artful liar"). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these prosecutorial misconduct claims.

### b. Comments on Invocation of Rights to Silence and Counsel

Petitioner also contends, in connection with his ineffective assistance of counsel claims, that he was deprived of a fair trial by the prosecutor's repeated questions and comments which focused on his cessation of the interview with Trooper Ulatowski and his questions of the police officers with respect to whether he needed counsel. *See* Trial Tr., dated 8/10/00, at 10; *id.*, dated 8/11/00, at 130-31, 151; *id.*, dated 8/14/00, at 126. The Court should disagree.

The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This provision applies to the states via the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). The Supreme Court has determined that this provision "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). Likewise, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). Despite this rule, the testimony and comments cited by petitioner did not violate the Fifth Amendment.

First, there was no impermissible comment on silence as understood in *Doyle*. *Doyle* does not apply where the accused actually speaks with the police. "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not

remained silent at all." *Anderson v. Charles*, 447 U.S. 404, 408 (1980). Here, petitioner did not

invoke his right to remain silent; rather, he spoke with the police. *See Burton v. Bock*, 320 F. Supp.

2d 582, 591 (E.D. Mich. 2004) (Lawson, J.) ("The mere refusal to answer or respond to a question,

without more, does not constitute an assertion or reassertion of the right to silence."), *aff'd*, 187 Fed.

Appx. 465, 471 (6th Cir. 2006). As the Eighth Circuit has explained,

> Where the accused initially waives his right to remain silent and agrees to
> questioning, however, no inducement has occurred. If the accused subsequently
> refuses to answer further questions, the prosecution may note the refusal because
> it now constitutes part of an otherwise admissible conversation between the police
> and the accused.

*United States v. Harris*, 956 F.2d 177, 181 (8th Cir. 1992); *see also, Lindgren v. Lane*, 925 F.2d

198, 201 (7th Cir. 1991) ("Petitioner has uncovered no case holding that a mere transcript witness'

reference to defendant's silence breaches the Fourteenth Amendment, nor have we discovered any

such authority.").

Further, the testimony was not elicited to imply that petitioner was guilty of the crime

charged. While a prosecutor must refrain from suggesting to the jury that a defendant hired an

attorney to generate an alibi or get his "story straight," *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th

Cir. 1990), habeas relief is not appropriate where the prosecutor's comment or a witness's testimony

offers no suggestion that the petitioner's hiring of an attorney establishes his or her guilt. *See Ridley

v. Walter*, No. 99-35240, 1999 WL 1040089, at *1 (9th Cir. Nov. 5, 1999); *cf. United States v.

Tocco*, 200 F.3d 401, 422-23 (6th Cir. 2000) (brief introduction of evidence that defendant had

consulted an attorney did not warrant reversal because "the mere act of hiring an attorney is simply

not probative of [the defendant's] guilt or innocence under the circumstances."). Viewed in context,

it is clear that the testimony was not to imply that petitioner was guilty, but to explain the

circumstances of the taking of the statement, and to rebut petitioner's claims about the coercive nature of the interview. In these circumstances, the testimony was not an improper comment on petitioner's invocation of his right to remain silent or to counsel. *See Noland v. French*, 134 F.3d 208, 216 (4th Cir. 1998) (habeas relief not warranted where prosecutor's comment on petitioner's invocation of his *Miranda* rights was used only to show the timing of certain events, not to suggest that petitioner was guilty of the crimes charged).

Finally, as explained in connection with petitioner's ineffective assistance of counsel claim, *see infra* part H.2.b, the allowance of this testimony was part of a deliberate strategy by counsel to help establish his claim that the police had coerced petitioner. Because this testimony was allowed to go unchallenged as part of a deliberate strategy, petitioner cannot now claim that the testimony deprived him of a fair trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these prosecutorial misconduct claims.

## G.      *Evidentiary Claim (Claim VI)*

Petitioner also argues that he was denied a fair trial by the improper admission of hearsay evidence. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### 1.      *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an

issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

2.      *Analysis*

Petitioner's convictions arise from his sexual assault of Kelsey, the older of the two Runft girls. At trial, the prosecution introduced statements from both Lindsey and Kelsey. Specifically, the prosecutor introduced Lindsey's statement that "Dickey has one of those," made to her father

while he was showering, suggesting that she had seen petitioner's penis. The prosecution also introduced Kelsey's statement to her parents that she too had seen petitioner's penis, and her follow-up comments, made after her parents questioned her, that she had touched petitioner's penis with her hand and mouth in the upstairs of the Thomson home. The trial court permitted the prosecution to introduce these statements under the tender years exception set forth in MICH. R. EVID. 803A. Petitioner contends that the requirements of this rule were not satisfied, and that petitioner was denied a fair trial by the introduction of these hearsay statement. The Court should disagree.

Under the Michigan version of the tender years exception, the following are not excluded by the hearsay rule:

> A statement describing an incident that included a sexual act performed with or on the declarant by the defendant or an accomplice is admissible to the extent that it corroborates testimony given by the declarant during the same proceeding, provided:
>> (1) the declarant was under the age of ten when the statement was made;
>> (2) the statement is shown to have been spontaneous and without indication of manufacture;
>> (3) either the declarant made the statement immediately after the incident or any delay is excusable as having been caused by fear or other equally effective circumstance; and
>> (4) the statement is introduced through the testimony of someone other than the declarant.
> If the declarant made more than one corroborative statement about the incident, only the first is admissible under this rule.
> A statement may not be admitted under this rule unless the proponent of the statement makes known to the adverse party the intent to offer the statement, and the particulars of the statement, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet the statement.

MICH. R. EVID. 803A.

At the outset, the admission of this type of evidence does not amount to a denial of due

process. Although there is little case law in this area,[4] the courts that have considered the issue have uniformly found that admission of child hearsay statements under the tender years exception does not deprive a defendant of a fair trial. *See People v. Galloway*, 726 P.2d 249, 253 (Colo. Ct. App. 1996); *Curtis v. State*, 441 S.E.2d 776, 778 (Ga. Ct. App. 1994); *People v. R.D.*, 476 N.E.2d 62, 64 (Ill. Ct. App. 1985); *State v. Hester*, 801 S.W.2d 695, 697 (Mo. 1991); *Jones v. State*, 781 P.2d 326, 328 (Okla. Ct. Crim. App. 1989); *Norris v. State*, 788 S.W.2d 65, 72 (Tex. Ct. App. 1990); *cf. Brodit v. Cambra*, 350 F.3d 985, 989-90 (9th Cir. 2003) (admission of hearsay under tender years statute did not deprive defendant of his right to present a defense).

Further, petitioner cannot show that the evidence was erroneously admitted under state law. Petitioner contends that Lindsey's statement was not admissible because it was not a "statement describing an incident that included a sexual act performed with or on the declarant by the defendant." There is no Michigan case law addressing what constitutes a "sexual act" under the rule, but even assuming that an act of exposure does not constitute a sexual act, petitioner cannot show that the evidence was improperly admitted. This is because Lindsey's statement was not offered to show the truth of the matter asserted but because that statement was the impetus for all that followed, and thus was necessary to explain the actions taken by her parents. Thus it was not hearsay under Rule 801, and Rule 803A was simply inapplicable. *See People v. Munsell*, No. 210989, 1999 WL 33434273, at *3 (Mich. Ct. App. Oct. 22, 1999) (Rule 803A inapplicable where victim's foster mother did not testify to a statement describing an incident that included a sexual act, but merely testified to a conversation which caused her to take certain actions). With respect to

---

[4]There is a significant body of caselaw, both state and federal, addressing the Confrontation Clause implications of hearsay testimony admitted pursuant to the tender years exception. Petitioner has not raised a confrontation challenge to the evidence.

Kelsey's statements, petitioner contends that everything she told her parents after the initial statement that she had seen petitioner's penis constitutes a separate statement prohibited by Rule 803A's limitation on first corroborative statements. However, the Michigan courts do not cabin the word "statement" in Rule 803A so restrictively. Rather, Kelsey's first "statement" includes the entire conversation with her parents, including her responses to their open ended questions seeking to explain and clarify her initial statement. *See In re Thomas*, No. 264549, 2007 WL 861105, at *2 (Mich. Ct. App. Mar. 22, 2007); *cf. People v. Dunham*, 220 Mich. App. 268, 272, 559 N.W.2d 360, 371 (1996).

Thus, this evidence was not improperly admitted under Rule 803A, and the admission of the evidence did not violate petitioner's right to due process of law. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.  *Ineffective Assistance of Counsel (Claims II, IV-VI)*

Finally, petitioner contends that both his trial and appellate attorneys rendered constitutionally ineffective assistance. Specifically, he contends that trial counsel was ineffective for: (1) offering testimony that the complainant was credible; (2) failing to object to prosecutorial misconduct; and (3) failing to move for suppression of petitioner's statement on the basis that the statement was involuntary. Petitioner also contends that his appellate counsel was ineffective for failing to raise on appeal his involuntary statement and hearsay evidence claims, and for failing to seek an evidentiary hearing in the state courts. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.  *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of

counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.    *Analysis*

   a. *Eliciting Testimony of the Victim's Credibility (Claim II)*

Petitioner first contends that counsel was ineffective for eliciting testimony that the victim

was credible. At trial, petitioner's counsel called Mary Kay Neuman, an employee of the Oakland County Prosecutor who had conducted the interview of Kelsey Runft at Care House. As a review of petitioner's questioning shows, counsel attempted through Neuman's testimony to support his claim that the police had made a rush to judgment and that Kelsey's story was a suggestion implanted by those who had interviewed and spoken with her. During this testimony, counsel elicited from Neuman information concerning research on the suggestibility of children in child sexual abuse cases. With this starting point, the following exchange occurred:

> Q: Do you believe that this child could have been suggestible?
> A: Could she have been?
> Q: Yes.
> A: I don't think she was suggestible.
> Q: Why not?
> A: Because her disclosure of the abuse she used other senses and so she had a description from her other senses that made what she said real credible.

Trial Tr., dated 8/11/00, at 218. Neuman also testified that she found Kelsey to be credible on the basis of her description of the penis and the senses she used to describe it. *See id*. at 220. The Michigan Court of Appeals rejected petitioner's ineffective assistance claim, explaining:

> It is apparent from the record that Neuman's testimony was necessary for the defense to pursue its theory that Neuman, as well as others who questioned the victim about the allegations against defendant, may have improperly influenced the victim's statements. Neuman's testimony established a foundation for the defense expert's testimony in this area. In light of the defense theory, defendant has not overcome the presumption of sound trial strategy.

*Thomson*, 2002 WL 1308776, at *2, slip op. at 3. The Court should conclude that this determination was reasonable.

Obviously, it would have been better for petitioner had Neuman admitted that she doubted the victim's credibility. However, this was not an option available to counsel. Counsel was faced with consistent testimony of the victim as to what had happened, as well as petitioner's own

36

inculpatory statements to Detective Hoke. In the face of this evidence, counsel chose a reasonable strategy of casting doubt on the prosecution's case by trying to establish that the victim's version of events did not really happen but was mere suggestion implanted by the police and others who had contact with her, and that petitioner's statements to the police were not true but were the result of police intimidation. This reasonable strategy required counsel to present to the jury those that had been involved in the interviews of the victim. And, despite the testimony set forth above, counsel was able to elicit from Neuman the general research regarding child suggestibility, and the fact that her interview of the victim did not comport with any established protocol. Counsel supported this theory with a defense expert, and argued extensively on the matter during closing argument. In light of the prosecution's evidence, counsel's strategic decision to pursue this line of defense was reasonable, even though ultimately unsuccessful. *See Brown v. Crosby*, 249 F. Supp. 2d 1285, 1322-23 (S.D. Fla. 2003) (internal quotation omitted) ("the fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel, for counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy."); *Jones v. Hollins*, 884 F. Supp. 758, 765 (W.D.N.Y.), *aff'd*, 89 F.3d 826 (2d Cir. 1995). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Failure to Object to Prosecutorial Misconduct (Claim II)

Petitioner also contends that counsel was ineffective for failing to object to the prosecutor's inappropriate arguments. As explained above, none of petitioner's prosecutorial misconduct claims have merit, and thus any objection by counsel would have been futile. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475

(6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993). Further, with respect specifically to the prosecutor's and witnesses's comments on petitioner's invocation of his rights to remain silent and to counsel, this evidence was used by counsel to suggest that petitioner's statement to Hoke was not true and was the result of police pressure. Evidence that his requests to cease talking and to obtain an attorney were ignored by the police was necessary to support this theory of the defense. As explained above in connection with counsel's presentation of Neuman's testimony, this strategy was reasonable under the circumstances, and thus counsel was not ineffective for failing to object to the testimony of petitioner's invocations. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Failure to Challenge Voluntariness of Statement (Claim IV)

Petitioner next contends that his trial counsel was ineffective for failing to challenge the voluntariness of his statement to the police. Although counsel moved to suppress the statement on the grounds that it was taken in violation of petitioner's Fifth Amendment rights under *Miranda*, counsel did not separately challenge the voluntariness of the statement itself. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

In order to establish *Strickland* prejudice on this claim, petitioner must show that a motion to suppress his statement would have been successful. *United States v. Thomas*, 38 Fed. Appx. 198, 203, 2002 WL 418138, *3 (6th Cir. 2002); *Lowry v. Lewis*, 21 F.3d 344, 346-47 (9th Cir. 1994); *cf. Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Here, petitioner cannot make such a showing. "Determining whether a confession is 'voluntary' for due process purposes entails an examination into the 'totality of the circumstances' to determine whether the confession was procured by

acceptable techniques that draw upon an essentially free and unconstrained choice or by unacceptable tactics that extract their results from an overborne will. The critical line of distinction is between 'self-direction' and 'compulsion.'" *Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). It is not enough that a defendant's will was "overborne" by some factor for which state officials are not responsible. "Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession." *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). There is no bright line test for determining whether a confession is voluntary, nor is any one factor dispositive. Rather, a court must "look[] to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case. Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishments, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999) (internal quotation and citation omitted); *accord, Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).

Here, petitioner does not point to any coercive police conduct by which his will was overborne. For the most part, petitioner's argument rehashes his *Miranda* argument that he was in custody at the time the statement was taken. *See* Memo. of Law in Supp. of Pet., at 45. However, even if petitioner were in custody–which as explained in connection with petitioner's *Miranda* claim he was not–this fact alone is insufficient to establish that the statement was involuntary. Petitioner claims that he was generally intimidated by the circumstances of the encounter with the police, but

the evidentiary hearing testimony belies any assertion of undue police coercion. On the contrary, the testimony established that petitioner was free to leave at any time and that petitioner himself knew this. There was no testimony that petitioner had been threatened, and indeed the testimony was that both Trooper Ulatowski and Detective Hoke were conversational. Petitioner does not allege, nor has he ever alleged, that he was deprived of food or sleep, that he was threatened in any way, or that the interviews were unusually long. Further, although he alleges that Detective Hoke offered to "help him," he does not allege that any specific promises were made or inducements offered in exchange for his statement. Vague promises that a confession will help a suspect do not render the confession involuntary. *See United States v. Burgess*, 33 Fed. Appx. 386, 389 (10th Cir. 2002); *United States v. Jarwal*, 47 F.3d 539, 542 (2d Cir. 1995). Thus, petitioner has provided nothing to show a reasonable probability that, had a motion to suppress the statements as involuntary been filed, it would have been granted. Accordingly, he is not entitled to habeas relief on this claim.

### d. Appellate Counsel (Claims V-VI)

Finally, petitioner contends that his appellate counsel was constitutionally ineffective for failing to raise his ineffective assistance of trial counsel and hearsay evidence claims on direct appeal. In the appellate counsel context, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained above, petitioner's ineffective assistance of trial counsel and hearsay evidence claims are without merit, and thus petitioner cannot show that counsel was ineffective for failing to raise them on direct appeal.

Petitioner also contends that his appellate counsel was ineffective for failing to properly move for an evidentiary hearing in the state courts on petitioner's ineffective assistance of trial

40

counsel claim. However, petitioner has pointed to no specific evidence or testimony which could have been adduced at an evidentiary hearing that would support his claims. *Cf. Harris v. Johnson*, 81 F.3d 535, 540 (5th Cir. 1996) (to establish entitlement to an evidentiary hearing in federal court, a habeas petitioner "must make sufficiently specific factual allegations; conclusory allegations will not suffice to mandate either discovery or a hearing."). *See generally*, *Smith*, 528 U.S. at 285 (petitioner bears "the burden of demonstrating prejudice.")*; Williams*, 529 U.S. at 394 (quoting with approval trial court's recognition that "[t]he petitioner bears the 'highly demanding' and 'heavy burden' in establishing actual prejudice."). Indeed, petitioner's claims are readily resolvable on the basis of the record that exists. With respect to counsel's failure to challenge the voluntariness of petitioner's statement, an evidentiary hearing was held which explored all of the circumstances of that statement, and no additional evidence is necessary to resolve this claim. Likewise, counsel's failure to object to prosecutorial misconduct is resolved by the trial transcript, which shows that the prosecutor did not make any improper argument. Finally, the reasonableness of counsel's defense theory is also apparent from the trial record, which as a whole shows the approach counsel took to the defense and the reasonableness of that approach in light of the prosecution's evidence. Thus, petitioner cannot show that a further evidentiary hearing in the state court would have had any impact on the viability of his claims, either on direct appeal or in this Court. He is thus not entitled to habeas relief based on counsel's failure to seek an evidentiary hearing. *See Chico-Polo v. Metrish*, No. 2:06-CV-10184, 2007 WL 1556641, at *8 (E.D. Mich. May 30, 2007) (Rosen, J.).

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his ineffective assistance of appellate counsel claims.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

s/Paul J. Komives_____
PAUL J. KOMIVES

UNITED STATES MAGISTRATE JUDGE

Dated: 7/15/08

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record by electronic
means or U.S. Mail on July 15, 2008.

s/Eddrey Butts
Case Manager